## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA

| | |
|---|---|
| **UNITED STATES SECURITIES AND EXCHANGE COMMISSION** : | |
| : | |
| **Plaintiff,** : | |
| : | |
| **vs.** : | **Civil Action No. 19-cv-____** |
| : | |
| **PETER BAKER, PRESTIGE GLOBAL** : | **Jury Trial Demanded** |
| **TRADING, LTD., ELIZABETH** : | |
| **OHARRIZ, DIVERSIFIED INITIATIVES** : | |
| **CONSULTING & LOGISTICS, INC., and** : | |
| **SIENNA BUSINESS GROUP, INC.** : | |
| : | |
| **Defendants.** : | |
| : | |

## COMPLAINT

Plaintiff United States Securities and Exchange Commission ("SEC"), for its

Complaint against Defendants Peter Baker, Prestige Global Trading, Ltd.,

Elizabeth Oharriz, Diversified Initiatives Consulting & Logistics, Inc., and Sienna

Business Group, Inc. (collectively, "Defendants"), alleges as follows:

## SUMMARY

1.     From 2013 to 2017, Defendants perpetrated multiple "prime bank"

scams and defrauded investors of over $2.2 million.

2.     Starting in 2013 and continuing into late 2017, Defendants deceived

1

investors into purchasing so-called "bank guarantees" or "standby letters of credit" that Defendants claimed had been issued by well-known commercial banks.

3.      Defendants misrepresented to investors that these bank guarantees or standby letters of credit, with nominal values of up to €150 million, were legitimate instruments in Defendants' control that they would provide to investors upon an advance payment of as little as $250,000.

4.      Defendants further misrepresented that investors could then "monetize" these bank guarantees or standby letters of credit by selling or leasing them to third parties at a substantial profit, and in at least one instance identified a phony purchaser to further the deception and collect additional fees.

5.      Contrary to their representations, Defendants never had control of legitimate bank guarantees or standby letters of credit.  Instead, after receiving investors' money, Defendants collaborated with third parties to fabricate phony bank instruments and other documents that Defendants then provided to investors.

6.      Defendants also misrepresented that investors' advance payments would be fully refundable unless and until Defendants provided the bank guarantees or standby letters of credit.  In fact, Defendants almost immediately used investors' money to pay personal expenses and/or transferred investors' money to third parties.

7. To prevent investors from uncovering their deception, Defendants included language in their purchase contracts prohibiting investors from contacting the banks supposedly issuing the bank guarantees or standby letters of credit. The purchase contracts provided that such inquiries would nullify the agreements and cause investors to forfeit any money they had already provided.

8. When Defendants could not produce legitimate bank instruments, they would avoid investors' complaints with elaborate fictions, claiming that the transaction was only temporarily delayed or that investors' profits had been intercepted overseas. In the end, Defendants' investors lost most or all of the money they invested and never received the instruments they were promised.

9. In total, Defendants perpetrated at least five of these scams between 2013 and 2017 and defrauded investors out of more than $2.2 million.

10. By engaging in the conduct alleged in this Complaint, Defendants violated, and unless restrained and enjoined will violate again, Section 10(b) of the Securities Exchange Act of 1934 ("Exchange Act") [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*], Section 17(a) of the Securities Act of 1933 ("Securities Act") [*15 U.S.C. § 77q(a)*], and Section 15(a) of the Exchange Act [*15 U.S.C. § 78o(a)*].

## JURISDICTION AND VENUE

11.     This Court has jurisdiction over this action pursuant to Sections 21(d), 21(e), and 27 of the Exchange Act [*15 U.S.C. §§ 78u(d), 78u(e), 78u-1, and 78aa*] and Sections 20(b) and 22(a)  of the Securities Act [*15 U.S.C. §§ 77t(b) and 77v(a)*].

12.     Venue in this district is proper pursuant to Section 27 of the Exchange Act [*15 U.S.C. § 78aa*] and Section 22(a) of the Securities Act [*15 U.S.C. § 77v(a)*].  Each of the Defendants engaged in transactions, acts, practices, and courses of business constituting the violations alleged herein within this District, and the Defendants can be found and do business in this District.  At all relevant times, Baker resided in this District, and Prestige Global Trading, Ltd. had its principal place of business here.

13.     The Defendants, directly and indirectly, have made use of the means and instrumentalities of interstate commerce, and the means and instruments of transportation and communication in interstate commerce, in connection with the transactions, acts, practices, and course of business alleged in this Complaint.

14.     Defendants Baker, Prestige, Oharriz, and Diversified entered into agreements to toll the applicable statute of limitations period from December 10, 2018 through June 9, 2019.

## DEFENDANTS

15.     **Defendant Prestige Global Trading, Ltd.** ("Prestige") is a Georgia corporation with its principal place of business in Lawrenceville, Georgia.  Prestige has never been registered with the Commission in any capacity.

16.     **Defendant Peter Baker**, age 74, is a resident of Lawrenceville, Georgia.  At all relevant times, Baker was the President and Chief Executive Officer of Prestige and the Vice President of Sienna Business Group, Inc., and his actions in this matter were conducted in those capacities.  Baker has never been registered with the Commission in any capacity.

17.     **Defendant Diversified Initiatives Logistics & Consultants, Inc.** ("Diversified") is a Florida corporation with its principal place of business in Miami, Florida.  Diversified has never been registered with the Commission in any capacity.

18.     **Defendant Sienna Business Group, Inc.** ("Sienna") is a Florida corporation with its principal place of business in Miami, Florida.  Sienna has never been registered with the Commission in any capacity.

19.     **Defendant Elizabeth Oharriz**, age 56, is a resident of Miami Shores, Florida.  At all relevant times, Oharriz was the President of both Diversified and Sienna, and her actions in this matter were conducted in those capacities.  Oharriz

has never been registered with the Commission in any capacity.

## FACTS

### I.   DEFENDANTS' HISTORY PEDDLING "BANK GUARANTEES" AND "STANDBY LETTERS OF CREDIT"

20.     The term "prime bank" fraud commonly refers to schemes in which fraudsters purport to sell investors financial instruments from a well-known bank that investors can then trade to generate enormous returns.  The purported instruments often have official-sounding names, including "bank guarantees," "bank debentures," and "stand-by letters of credit."  In theory, investors would pay an advance fee and, in return, obtain control of one of these instruments.  In reality, after investors pay their advance fee, the fraudsters either disappear or string their victims along to extract more money and delay complaints to law enforcement.

21.     Since at least 2011, Defendants Baker, Oharriz and their respective companies have orchestrated multiple "prime bank" frauds, selling fraudulent "bank guarantees" and "standby letters of credit" to unwitting investors.  Baker and Oharriz, who have no education or training in commercial financial transactions or investments, represented to investors that these instruments could then be "monetized" to generate substantial profits by selling or leasing them to third parties or using them to secure loans.  They collected millions in "advance fees" from their victims yet have never once delivered an authentic bank instrument.

6

22.     Defendants' experience hawking these transactions presented unmistakable red flags that the instruments they were selling were fake.  Oharriz, acting as a representative for all Defendants, relied on an individual residing abroad for documents substantiating the transactions.  This person, whom Oharriz never met, repeatedly provided letters or bank documents, purportedly from the banks and signed by senior bank executives, that were rife with inaccuracies, grammatical errors, and misspellings.  Oharriz would then edit the documents and return them for revision.  Once Oharriz was satisfied with a document, she would pass it along to Baker, who would present it to investors.

23.     The details of these transactions were shrouded in mystery, further indicating that they were scams, not legitimate deals.  Defendants' contracts with investors included warnings that the investors could not contact the issuing banks and threatened that if they did, their contracts would be canceled and they would lose any money they had already invested.  Oharriz refused to tell even Baker, her partner on these transactions, the identity of the individuals they were relying on to obtain bank instruments.

24.     Furthermore, all of the transactions failed.  Not one of Defendants' investors has ever realized a profit from these transactions.  To the contrary, investors almost universally lost all of the funds they invested, despite Defendants'

promises of extraordinary returns.

25.     Most strikingly, on one occasion in 2012, an investor attempted to monetize its "bank guarantee" by selling or leasing it to a third party.  That third party, however, recognized the document for the fraud it was.  That person sent Baker a bullet-pointed list of all of the ways he could tell the document was fabricated.  Defendants never provided their investor (or anyone else) with a legitimate document in that transaction, nor did they return the investor's money.

26.     Despite these red flags and others, Baker and Oharriz continued to offer bank instruments to investors.  As detailed below, from November 2013 to November 2016, Defendants, operating through Prestige, received over $1.5 million in advance fees from three groups of investors.  In October 2017, Defendants, acting through Sienna, received almost $800,000 in advance fees from two additional investors.

## II.     THE FRAUD ON HAWK'S REST INVESTORS

### A. The December 2013 Contract

27.     From late 2013 through 2017, Defendants Baker, Oharriz, Diversified, and Prestige defrauded a group of investors (the "Hawk's Rest Investors") out of more than $500,000 by making material misrepresentations about "bank guarantee" instruments supposedly issued by The Hongkong and Shanghai

Banking Corporation Ltd. (commonly known and referred to as "HSBC").

28.    Beginning in late 2013, Baker communicated in person, by telephone, and by email from his office and residence in Lawrenceville, Georgia with an investor (the "lead Hawk's Rest Investor") about acquiring a so-called "bank guarantee" instrument from HSBC with a face value of €100 million.

29.    Baker explained to the lead Hawk's Rest Investor that he and the other Hawk's Rest Investors could acquire the bank guarantee for €250,000 (approximately $385,000 at the time).

30.    Baker also represented to the lead Hawk's Rest Investor that the $385,000 advance fee would be fully refundable unless and until Baker and Prestige provided the bank guarantee.

31.    In or around late December 2013, Baker and Prestige entered into a contract with the lead Hawk's Rest Investor and Hawk's Rest, LLC, dated December 23, 2013 (the "December 2013 contract").  Pursuant to this agreement, Baker and Prestige promised to deliver a €100 million bank guarantee from HSBC upon payment of a €250,000 advance fee.  In the contract, Baker and Prestige "affirmed to have control of said instrument."

32.    The December 2013 contract prohibited the lead Hawk's Rest Investor, Hawk's Rest, or their lawyers or representatives from "prob[ing] . . . this

transaction," warning that efforts to do so "shall be cause for the transaction's immediate cancellation" and "the bank instrument . . . will become inoperable." The contract further provided "any unauthorized bank calls will result in the immediate cancellation of this transaction and subject the violating party responsible for damages."

33.     Between January 2014 and July 2014, relying on Baker's and Prestige's representations, the Hawk's Rest Investors transferred a total of $251,000 to a purported escrow account held by a company called Guaranteed Investigations, Inc.  (the "Guaranteed account").  The Hawk's Rest Investors intended for that money to be applied toward the €250,000 advance fee.

34.     Within days of each transfer by a Hawk's Rest Investor into the Guaranteed account, Baker would request that the money be released to himself or to Prestige.

35.     Baker would then spend a portion of that money on cash withdrawals or personal expenses, including purchases at a furniture store and local sports bars and restaurants, and would transfer the balance to Defendants Oharriz and Diversified.

36.     Oharriz, in turn, used the money she and/or Diversified received for cash withdrawals or personal expenses, including mortgage payments on her

personal residence and utility payments.

### B. The August 2014 Contract

37.     During this same period in 2014, a separate investor was also transferring money to the Guaranteed account.  All parties understood that this investor's transfers would be pooled with the Hawk's Rest Investors'.  By August 2014, the Hawk's Rest Investors and this other investor contributed a total of $495,000.

38.     On August 5, 2014, Baker and Prestige entered into a second contract with the lead Hawk's Rest Investor and Hawk's Rest (the "August 2014 contract"), which superseded all existing agreements between the parties.  Pursuant to this contract, Baker and Prestige promised to deliver a €150 million bank guarantee from HSBC, which they again "affirmed to have control of" at that time, upon payment of a $495,000 advance fee.

39.     The August 2014 contract again prohibited the lead Hawk's Rest Investor, Hawk's Rest, or their lawyers or representatives from "prob[ing] . . . in[to] this transaction," stating that efforts to do so "shall be cause for the transaction's immediate cancellation" and "the bank instrument . . . will become inoperable."  The August 2014 contract also provided that "any unauthorized bank calls will result in the immediate cancellation of this transaction and subject the

violating party responsible for damages."

40.     In the August 2014 contract, Baker and Prestige represented that any purchase fee paid by investors through the "attorney-held escrow facility" would be fully refundable if Baker failed to deliver the bank guarantee.

41.     Because the Hawk's Rest Investors and the other investor had already contributed the full amount of the advance fee under the August 2014 contract, Baker and Prestige had an immediate obligation to deliver the €150 million bank guarantee.

### C. Misrepresentations in the December 2013 and August 2014 Contracts

42.     Contrary to their contractual representations, Baker and Prestige never had possession or control of a €100 million or €150 million bank guarantee from HSBC, which defendants knew or were reckless in not knowing.

43.     Further, Baker and Prestige did not intend to use money transferred by the Hawk's Rest Investors to purchase a bank guarantee, and they similarly misrepresented their ability and intent to return the money if they failed to deliver a €150 million bank guarantee.

44.     By the time Baker and Prestige entered into the August 2014 contract, the investors' money was already gone, either spent by Baker or transferred to Defendants Oharriz and Diversified, who in turn used it for Oharriz's personal

expenses.  Defendants knew or were reckless in not knowing that they had no ability to return the Hawk's Rest Investors' money, just as they had no ability to deliver a €150 million bank guarantee.

45.     Each of these representations was material to the parties' transaction. The object of the December 2013 and August 2014 contracts was the delivery of a €100 million or €150 million bank guarantee to the Hawk's Rest Investors.  And the promise to return the Hawk's Rest Investors' money if that object could not be achieved, had it not been a false promise, would have significantly reduced the risk the investors' took by transferring their money to the Guaranteed account.

### D. Defendants Provide False Documents to the Hawk's Rest Investors

46.     Rather than admit that they could neither provide the promised bank guarantee nor return the investors' money, Defendants Baker and Oharriz coordinated to provide falsified HSBC "bank guarantee" documents to the Hawk's Rest Investors in August 2014.

47.     Oharriz, acting on behalf of Diversified, worked with a foreign third party to manufacture phony HSBC "bank guarantee" documents, which she reviewed and edited before Baker sent them to the Hawk's Rest Investors.  The falsified HSBC bank guarantee documents contained cut-and-paste logos and signature blocks, and in most instances misspelled the "Shanghai" in HSBC's

official name as "Shangai."  Defendants knew or were reckless in not knowing that these documents were phonies.

### E.  Defendants' False Promise to Help Monetize the Fake Bank Guarantee

48.     When they initially pitched the bank guarantee transaction to the Hawk's Rest Investors, Defendants assumed no responsibility for finding a third party that could lease the instrument from the Hawk's Rest Investors, which was supposed to be how the investors would earn a profit.

49.     But the Hawk's Rest Investors could not lease the bank guarantee to a third party, because, as Defendants knew or were reckless in not knowing, the document was phony.

50.     In or around March 2015, Baker presented the lead Hawk's Rest Investor with a new proposal.  Baker told the lead Hawk's Rest Investor that the Hawk's Rest bank guarantee could be combined with multiple other bank guarantees into a single, larger instrument that could then leased be to a HSBC customer whom Baker knew and trusted.  The Hawk's Rest Investors, however, would have to pay $250,000 to participate in this larger transaction.

51.     Baker told the lead Hawk's Rest Investor and a new Hawk's Rest Investor that this deal was guaranteed to succeed and that the Hawk's Rest Investors would earn at least €50 million.

14

52.     In reliance on Baker's representations, the lead Hawk's Rest Investor and the new investor collectively invested $250,000 in March and April 2015. On or about March 30, 2015, Baker instructed the lead Hawk's Rest Investor to transfer $50,000 to a trucking company as a part of this new transaction. Then, on or about April 22, 2015, the new investor transferred $200,000 to the Guaranteed account. That same day, Baker directed that that money be transferred to an unrelated third party overseas.

53.     On or about June 9, 2015, Baker updated the lead Hawk's Rest Investor on the new transaction, reporting that a line of credit with a total value of €500 million should be available within thirty days.

54.     On or about June 25, 2015, Baker provided the lead Hawk's Rest Investor with a summary of "the different stages of the pending line of credit transaction." According to this summary, various instruments were to be "syndicate[d]" into a single safe keeping receipt ("SKR") of €500 million. The SKR would then be used as collateral for a line of credit of at least €275 million.

55.     No line of credit was made available to the Hawk's Rest Investors within thirty days of June 9, 2015 or at any time thereafter.

56.     When Hawk's Rest Investors inquired about the status of the deal, Baker told them that the transaction was progressing and that they only needed to

be patient a little longer.  For example, on August 2, 2016, a frustrated Hawk's

Rest Investor emailed Baker to express his concerns that the deal might fall

through entirely.  Baker replied the next day to say that he and Oharriz felt

"confident that the funding will get released in the very near future."  Baker

represented to the investor that "[t]he money has been made from the trade and it is

ready to be disbursed," and that the "proper people" at the relevant bank had been

contacted to release the funds.

57.     Eventually, Baker could no longer maintain the fiction that the

transaction was on track.  Baker's story then shifted, and he told investors that he

and Oharriz had involved law enforcement agencies to ensure the release of funds.

For example, on March 29, 2017, Baker emailed an investor to say that the

transaction was "in the hands of law enforcement" and that he (Baker) "want[ed]

this transaction completed worse then [sic] you can imagine."

58.     On May 30, 2017, Baker sent the lead Hawk's Rest Investor a letter

with the subject, "Updated Status – Investment in a Line of Credit Transaction."

In this letter, Baker represented that the transaction was complete but that the

profits had been intercepted and "deposited into accounts controlled by selected

project associates."

59.     Baker's representations to investors in 2015, 2016 and 2017 regarding

the status of the transaction were false, which Defendants knew or were reckless in not knowing.  There was no transaction, as the underlying bank guarantees were phony.  The delay in the Hawk's Rest Investors realizing the profits they had been guaranteed was not caused by "project associates" intercepting the money but rather by the fact that the entire transaction was a complete fabrication.

60.    To date, the Hawk's Rest Investors have been refunded none of their money, including the amounts Defendants used for their own personal expenses.

### III.    The Fraud on GALP

61.    In 2016, Defendants Baker, Prestige, Oharriz, and Diversified engaged in a similar scheme, defrauding an investor out of over $400,000.

62.    On or around January 13, 2016, Baker and Prestige entered into a purchase agreement with a Costa Rican company, Gestion Austral Los Pinos SA ("GALP"), in which Baker and Prestige agreed to provide a standby letter of credit (referred to in the agreement as a "SBLC") with a face value of €100 million upon GALP's payment of a €500,000 "financial fee."

63.    In the January 2016 purchase agreement, Baker and Prestige "affirmed to have control of said SBLC" and to have "the capacity and ability . . . to sell and transfer to [GALP] said financial instrument in the form of an Irrevocable Standby Letter of Credit."  The purchase agreement further provided

that if Baker and Prestige were unable to deliver the standby letter of credit, they would "refund and return the Financial Fee in full."

64.    As in the Hawk's Rest transaction, the purchase contract with GALP prohibited "unauthorized calls by any Party or its representative lawyers to probe or communicate in an improper way to any Party's bank or bank officer in this transaction."  Any such calls would "result in contract cancellation."

65.    On or around January 26, 2016, GALP transferred $543,125 to the Guaranteed account and the next day authorized the release of that money to Baker for the express purpose of purchasing the standby letter of credit.

66.    As in the Hawk's Rest scheme, Defendants' contractual representation that they controlled the standby letter of credit at the time the purchase agreement was signed was false, as was their guarantee that they would return GALP's money if they could not deliver the instrument.  And as in the Hawk's Rest scheme, these misrepresentations were material as they went directly to the heart of the transaction and the risks associated with it.  And again, Defendants knew or were reckless in not knowing that they had misrepresented their control of a standby letter of credit and their intent or ability to refund GALP's money.

67.    On or about January 28, 2016, Baker personally received almost $50,000 of GALP's money from the Guaranteed account, which he intermingled

with his own money and promptly used for large cash withdrawals and personal expenses, including a payment of $2959 to Atlanta Classic Cars. Baker also directed $24,885 of the money he received to Oharriz, who spent it on cash withdrawals and personal expenses, including purchases at Wal-Mart, mortgage payments, and payments to a church based in Miami. Baker directed the balance of GALP's money overseas to a third party.

68.    Once GALP's money left the Guaranteed account, Defendants had no way to return GALP's financial fee when they inevitably failed to deliver the standby letter of credit.

69.    By February 2016, GALP began asking for a refund of its financial fee. Rather than admit that they could neither deliver the standby letter of credit nor refund GALP's money, Defendants sent GALP a falsified bank document purporting to show that the standby letter of credit had been issued. Oharriz, acting on behalf of Diversified, obtained the document from a third party and passed it on to Baker, who emailed it to a GALP representative on February 26, 2016. Defendants knew or were reckless in not knowing that this document was a fake.

70.    GALP's representative recognized the document for the forgery that it was and reiterated GALP's request for a refund. The representative pointed out

basic errors on the face of the document, including references to the wrong bank and misspellings.

71.     Baker continued to misrepresent that GALP would eventually receive its standby letter of credit.  On February 29, 2016, in furtherance of the ruse that the transaction was on track, Baker sent GALP's representative another set of falsified documents that he received from Oharriz.  These documents purported to show that the standby letter of credit had been issued.  Yet again, the GALP representative pointed out significant errors in the documents and questioned their authenticity.  The representative continued to ask for a refund of GALP's advance fee.

72.     Eventually, Defendants used money they received from a subsequent investor to return $100,000 of GALP's advance fee.  To date, GALP has not received a refund of the remaining $443,125 of its advance fee, nor has it received a standby letter of credit.

**IV.     The Fraud on Capital Consulting**

73.     Defendants defrauded another investor in 2016, receiving $565,000 in exchange for a standby letter of credit they never had the means of providing.

74.     In or around September 2016, Baker communicated in person, by telephone, and by email from his office and residence in Lawrenceville, Georgia

with a representative of Capital Consulting, LLC, a company registered in New

Mexico, about acquiring a standby letter of credit with a face value of €100

million.  Baker told Capital Consulting's representative that prior clients had

profited from the acquisition of bank instruments such as standby letters of credit.

75.    In late September 2016, Prestige entered into a purchase agreement

with Capital Consulting, LLC.  In the purchase agreement, which Baker signed on

behalf of Prestige, Prestige misrepresented that it had control of a standby letter of

credit in the amount of €100 million, which it agreed to sell to Capital Consulting

upon payment of a €500,000 "financial fee."  Prestige further promised that

Prestige would refund the financial fee if it failed to deliver the deliver the

instrument.  In an escrow agreement executed in connection with the transaction,

Prestige and Baker promised to use the financial fee for the "sole purpose" of

obtaining the standby letter of credit and reiterated that the financial fee was

"100% refundable immediately" if Prestige were unable to deliver.

76.    As in the prior schemes, Defendants' contractual representation that

they controlled the standby letter of credit at the time the purchase agreement was

signed was false, as was their guarantee that they would return Capital

Consulting's money if they could not deliver the instrument.  These

misrepresentations were material in that they related to the Defendants' ability to

achieve the object of the transaction (i.e., the delivery of the standby letter of credit) and the risks associated with the deal.  And Defendants knew or were reckless in not knowing that they would neither deliver the instrument nor refund Capital Consulting's money.

77.     Between October 3 and October 11, 2016, Capital Consulting transferred a total of $565,000 into the Guaranteed account.  Within days, Baker caused $228,675 of that money to be transferred to accounts he controlled.  Of that amount, he transferred $77,000 to accounts Oharriz controlled, sent $104,000 to a third party for an unrelated real estate transaction, transferred $2,000 to his wife, and spent almost all of the balance on cash withdrawals and personal expenses, including over $300 at the Cigar House in Lawrenceville, Georgia.  Baker later transferred the remainder of Capital Consulting's money directly to unrelated third parties, including a total of $100,000 that he used to repay a portion GALP's financial fee.

78.     Oharriz spent all or substantially all of the $77,000 that she received from Baker on cash withdrawals and personal expenses, including $1,451 at Best Buy and multiple mortgage payments on her personal residence.

79.     On or about October 18, 2016, Baker emailed Capital Consulting falsified bank documents that he had received from Oharriz and Diversified.  These

documents purported to show that HSBC had issued a €100 million bank guarantee to Sino Rising Group, Ltd., the entity that Capital Consulting had designated as the beneficiary of the standby letter of credit.  The documents were riddled with errors, including misspellings, grammatical errors, and invalid reference numbers.  Most glaringly, Capital Consulting had contracted to receive a standby letter of credit, not a bank guarantee.  When Capital Consulting brought this inconsistency to Baker's attention, he promised to remedy the error, with no explanation for how it occurred.

80.     On or about October 20, 2016, Baker emailed Capital Consulting a new round of phony documents.  The documents now referred to a standby letter of credit, but other errors remained.  At that point, Capital Consulting began to question the authenticity of the documents, but Baker insisted they were genuine.  The next day, Oharriz and Diversified sent Baker additional documents purporting to demonstrate the issuance of the standby letter of credit, which Baker in turn passed on to Capital Consulting.

81.     Over the next several weeks, Capital Consulting continued to question the authenticity of the documents it had received, and Baker continued to insist they were genuine and to pass along falsified documents he received from Oharriz and Diversified.  Defendants knew or were reckless in not knowing that all of the

purported bank documents they delivered to Capital Consulting were fakes.

82.     To confirm what it already knew—that Defendants were peddling falsified documents—Capital Consulting reached out to HSBC directly in November 2016.  HSBC's Financial Crimes and Compliance Investigations group reviewed documents Capital Consulting received from the Defendants and confirmed that they were not genuine and had not been issued by HSBC.  Capital Consulting forwarded that information to Baker, who passed it on to Oharriz. Despite seeing HSBC's own representation that the documents were fraudulent, Defendants continued to insist that they were valid.

83.     As it was debating with Defendants regarding the authenticity of the bank documents, Capital Consulting asked for a return of its financial fee. Although Baker agreed to return Capital Consulting's money, he never followed through on that promise.

84.     To date, Capital Consulting has not received a valid standby letter of credit or a return of its financial fee, except for the return of the escrow fee of $4,500 it received from Guaranteed.

## V.     The Fraud on Transatlantic

85.     Through 2016, Baker was the principal contact between Defendants and their investors.  In 2017, however, Oharriz began directly soliciting investors

with Baker to purchase standby letters of credit through her company, Defendant Sienna.

86.    In or around September 2017, Oharriz and Baker communicated in person, by telephone, and by email from their respective residences and offices with an individual investor with little investing experience.

87.    Oharriz and Baker told the investor that Sienna could obtain and monetize a standby letter of credit that would earn him millions of dollars in profit. According to Defendants' representations, Sienna would place money from the standby letter of credit into a trading platform, where it would generate up to $20 million in profits.  Neither Oharriz nor Baker told the investor about any risks associated with the deal.

88.    Oharriz told the investor that she specialized in transactions involving the issuance and monetization of bank instruments and that she had extensive experience facilitating transactions of this nature.  She did not tell the investor that none of her prior deals had succeeded, that none of the investors ever made any money from the transactions, and that many of her investors in fact lost money because their initial payments were not returned.

89.    Baker and Oharriz told the investor that substantially all of the financial fee would be paid to "the provider" and the issuing bank and that they

(Baker and Oharriz) would be paid on the back end of the transaction.

90.     Each of these representations was false or omitted information necessary to make them not misleading.  These misrepresentations were also material in that they directly related to the heart of the proposed deal and the risks associated with it.  Defendants knew or were reckless in not knowing that they were making misrepresentations to their investor.

91.     On or about September 29, 2017, Sienna and Transatlantic Bdr Ltd., LLC ("Transatlantic"), an entity that the investor controlled, entered into a Deed of Agreement pursuant to which Sienna agreed to sell Transatlantic a €50 million standby letter of credit in exchange for an advance payment of €175,000.  In that contract, which Oharriz signed on behalf of Sienna, Sienna promised to deliver the instrument within five days of receipt of the advanced payment.

92.     On or about October 3, 2017, Oharriz issued a "Refund Guaranteed Letter" to Transatlantic's head of development.  In that letter, Oharriz represented that Sienna would refund Transatlantic's money if Sienna failed to deliver the standby letter of credit.

93.     Contrary to their misrepresentations, Defendants never had the ability to secure a €50 million standby letter of credit, nor did they intend to return Transatlantic's money when they inevitably could not deliver a valid instrument.

As in the prior schemes, these misrepresentations were material in that they related to the Defendants' ability to achieve the object of the transaction (the delivery of the standby letter of credit) and the risks associated with the deal.  And as in the prior schemes, Defendants knew or were reckless in not knowing that their representations were false.

94.    On or about October 12, 2017, Transatlantic transferred $207,157.59 to a purported escrow account held by a company called Indeva Corporation (the "Indeva account").

95.    On or about October 20, 2017, Oharriz caused $30,000 of Transatlantic's money to be transferred to an unrelated third party overseas.

96.    Between October 23, 2017, and November 17, 2017, Oharriz caused a total $172,157.59 of Transatlantic's money to be transferred to a Sienna account Oharriz controlled.

97.    On or about October 23, 2017 and November 10, 2017, Oharriz transferred a total of $38,578.50 of Transatlantic's money from Sienna's account to Baker.

98.    Baker and Oharriz used Transatlantic's money for cash withdrawals or personal expenses.  Oharriz's personal expenses included mortgage payments on her primary residence and purchases at Total Wine, Macys and Home Depot.

Baker's personal expenses included car loan payments, purchases at Allen Edmonds, and transfers to his wife.

99.    None of Transatlantic's money was used to purchase a standby letter of credit.

100.   As time passed, Transatlantic pressed for Sienna to deliver on its promises.  Rather than admit Defendants' past deceptions, Oharriz continued to mislead Transatlantic, at one point flatly lying and telling Transatlantic's representative that the advance fee was with "the provider" of the standby letter of credit, not that she and Baker had squandered it on personal expenses.

101.   To date, Transatlantic's money has not been refunded, and it has never received the standby letter of credit it was promised.

**VI.    The Fraud on ADJV04**

102.   At the same time as they were defrauding Transatlantic, Defendants were running a similar scheme on a different investor, a European investment fund called ADVJ04.  Oharriz and Baker communicated in person, by telephone, and by email from their respective residences and offices with representatives of ADVJO4.

103.   On or about November 6, 2017, ADVJO4 and Sienna entered into a Deed of Agreement pursuant to which Sienna agreed to lease a €100 million bank

guarantee to ADVJO4 in exchange for a €500,000 advance payment.  In that contract, which Oharriz signed on behalf of Sienna, Sienna promised to have the bank guarantee delivered to ADVJO4's bank within five days of receipt of the advance payment.

104.   On or about November 9, 2017, Oharriz, acting on behalf of Sienna, provided a "Refund Guarantee Letter" to the director of ADVJO4.  In that letter, Oharriz misrepresented that Oharriz and Sienna would refund ADVJ04's money if they failed to deliver the bank guarantee as promised in the Deed of Agreement.

105.   Contrary to their misrepresentations, Defendants never had the ability to secure a €100 million bank guarantee, nor did they intend to return ADVJ04's money when they inevitably could not deliver a valid instrument, which Defendants knew or were reckless in not knowing.  Those misrepresentations were material in that they related directly to the central purpose of the transaction and the risks associated therewith.

106.   On or about November 13, 2017, ADVJ04 transferred $583,000 to the Indeva account.  On November 22, 2017, Oharriz authorized the transfer of $98,165 of ADVJ04's money from the Indeva account to Baker, who then used it for cash withdrawals and personal expenses, including a $1660 payment to Carmax and a $1490 payment to a furniture store.

107.   On November 24, 2017, Oharriz authorized the transfer of $82,500 of ADVJ04's money to Sienna, which in turn transferred $37,500 to Oharriz personally.  And on November 28, 2017, Oharriz authorized the transfer of another $82,500 of ADVJ04's money to a Diversified account that she controlled.  She subsequently passed on some of that money to Baker and used the majority of it on her own personal expenses, including utility payments and dining.

108.   The balance of ADVJ04's money was eventually distributed between Oharriz and Baker or sent overseas to unrelated third parties.

109.   To date, Oharriz has only refunded $10,000 of ADVJ04's $583,000 fee and has not delivered a valid bank guarantee.

## FIRST CLAIM FOR RELIEF
### Violations of Securities Exchange Act Section 10(b) and Rule 10b-5 Thereunder

110.   The SEC re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 109, inclusive, as if fully set forth herein.

111.   Each Defendant, with scienter, by use of the means or instrumentalities of interstate commerce or of the mails, in connection with the purchase or sale of securities, directly or indirectly:

(a)   employed devices, schemes, or artifices to defraud;

(b)   made untrue statements of material fact or omitted to state material

facts necessary in order to make the statements made, in light of the
circumstances under which they were made, not misleading; and/or

(c)    engaged in acts, practices, or courses of business which operated or
would operate as a fraud or deceit upon any person.

112.   By reason of the actions alleged herein, each Defendant violated
Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder
[*17 C.F.R.§ 240.10b-5*], and unless restrained and enjoined will continue to do so.

**SECOND CLAIM FOR RELIEF**
**Violations of Securities Act Section 17(a)**

113.   The Commission re-alleges and incorporates by reference each and
every allegation in paragraphs 1 through 109, inclusive, as if fully set forth herein.

114.   Each Defendant, by use of the means or instrumentalities of interstate
commerce or of the mails, in the offer or sale of securities, directly or indirectly:

(a)    employed, with scienter, devices, schemes, or artifices to defraud;

(b)    obtained money or property by means of any untrue statement of a
material fact or any omission to state a material fact necessary in order
to make the statements made, in light of the circumstances under
which they were made, not misleading; and/or

(c)    engaged in any transaction, practice, or course of business which
operated or would operate as a fraud or deceit upon the purchaser.

115.   By reason of the actions alleged herein, each Defendant violated Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*], and unless restrained and enjoined will continue to do so.

## THIRD CLAIM FOR RELIEF
### Violations of Securities Exchange Act Section 15(a)

116.   The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 109, inclusive, as if fully set forth herein.

117.   Defendants Baker and Oharriz, by use of the mails or of the means or instrumentalities of interstate commerce, effected transactions in, and/or induced or attempted to induce the purchase or sale of, a security while not associated with a broker or dealer that was registered with the Commission in accordance with Section 15(b) of the Exchange Act.

118.   By reason of the actions alleged herein, Defendants Baker and Oharriz violated  Section 15(a) of the Exchange Act [*15 U.S.C. § 78o(a)*], and unless restrained and enjoined will continue to do so.

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a Final Judgment:

### I.

Finding that Defendants violated the provisions of the federal securities laws

32

as alleged herein;

## II.

Permanently restraining and enjoining Defendants from, directly or indirectly, engaging in conduct in violation of Section 10(b) of the Exchange Act [*15 U.S.C. § 78j(b)*] and Rule 10b-5 thereunder [*17 C.F.R. § 240.10b-5*], Section 17(a) of the Securities Act [*15 U.S.C. § 77q(a)*], and Section 15(a) of the Exchange Act [*15 U.S.C. § 78o(a)*];

## III.

Ordering Defendants to disgorge, with prejudgment interest, all ill-gotten gains received or benefits in any form derived as a result of the actions alleged herein;

## IV.

Ordering Defendants to pay civil penalties pursuant to Exchange Act Section 21(d)(3) [*15 U.S.C. § 78u(d)(3)*] and Securities Act Section 20(d) [*15 U.S.C. § 77t(d)*]; and

## V.

Granting such other and further relief as this Court may deem just, equitable, or necessary.

Dated:       June 3, 2019                    Respectfully submitted,

                                    /s/ Melissa J. Armstrong
                                    M. Graham Loomis
                                    Regional Trial Counsel
                                    Georgia Bar No. 457868
                                    loomism@sec.gov
                                    950 East Paces Ferry Road, N.E.
                                    Suite 900
                                    Atlanta, Georgia 30326
                                    (404) 842-7600

                                    Melissa J. Armstrong
                                    Texas Bar No. 24050234
                                    armstrongme@sec.gov
                                    Christina McGill
                                    New York Registration No. 4262788
                                    mcgillch@sec.gov
                                    Matthew B. Reisig
                                    New York Registration No. 4898094
                                    reisigm@sec.gov
                                    Timothy N. England
                                    California Bar No. 140332
                                    englandt@sec.gov
                                    100 F Street, N.E.
                                    Washington, D.C. 20549
                                    (202) 551-6000

                                    COUNSEL FOR PLAINTIFF
                                    UNITED STATES SECURITIES
                                    AND EXCHANGE COMMISSION